Filed 1/23/23 P. v. Farias CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>MARTIN ANTHONY FARIAS,<br><br>    Defendant and Appellant. | F084386<br><br>(Super. Ct. No. VCF110225B-03)<br><br>**OPINION** |

### THE COURT\*

APPEAL from an order of the Superior Court of Tulare County.  Antonio A. Reyes, Judge.

Victor J. Morse, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the Attorney General, Sacramento, California, for Plaintiff and Respondent.

-ooOoo-

---

\*        Before Levy, Acting P. J., Detjen, J. and DeSantos, J.

Defendant Martin Anthony Farias was convicted in 2004 of second degree murder and was found to have personally discharged a firearm resulting in serious injury and death. In 2022, he petitioned for resentencing pursuant to pursuant to Penal Code former section 1170.95[1] (now § 1172.6),[2] based upon the changes to the felony-murder rule and the natural and probable consequences doctrine of aider and abettor liability effectuated by Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437). His petition was denied.

Appointed counsel for defendant asked this court to review the record to determine whether there are any arguable issues on appeal.[3] (*People v. Wende* (1979) 25 Cal.3d

---

[1] All further undesignated statutory references are to the Penal Code unless otherwise indicated.

[2] In the wake of our Supreme Court's decision in *People v. Lewis* (2021) 11 Cal.5th 952, the Legislature amended former section 1170.95 to adopt certain of *Lewis*'s holdings. (Stats. 2021, ch. 551, § 1, subd. (b).) The Legislature later renumbered the provision to section 1172.6, without substantive change, effective June 30, 2022. (Stats. 2022, ch. 58, § 10.) Citations in this opinion to section 1172.6 are to the current version of the provision as codified in section 1172.6; citations to former section 1170.95 are to the version of the provision as it existed on the date of the trial court's order on defendant's petition.

[3] When we began our review of this case, it was an open question whether *Wende* review was required from an appeal of a postconviction order denying sentencing relief. Many courts had held that such review was not required. (E.g., *People v. Cole* (2020) 52 Cal.App.5th 1023, 1028, review granted Oct. 14, 2020, S264278 ["*Wende*'s constitutional underpinnings do not apply to appeals from the denial of postconviction relief"]; *People v. Freeman* (2021) 61 Cal.App.5th 126, 133, review denied May 12, 2021, S268011 [*Wende* procedures inapplicable to appeal from an order revoking postrelease community supervision]; *People v. Flores* (2020) 54 Cal.App.5th 266, 273 [*Wende* procedures inapplicable to appeal from denial of petition for resentencing under § 1172.6].)

On December 19, 2022, our Supreme Court held in *People v. Delgadillo* (2022) 14 Cal.5th 216 that *Wende* procedures do not apply to appeals from the denial of postconviction relief under section 1172.6 and created a different procedure for that situation. (*Delgadillo*, at pp. 221–222.) The court instructed that on appeal from an order denying section 1172.6 relief, a counsel who finds no arguable issues should file a brief informing the appellate court of that determination and include a concise factual

436.) Defendant was advised of his right to file a letter stating any grounds on appeal within 30 days of the date of filing of the opening brief. Defendant filed a letter contending that his second degree murder conviction did not require a finding of actual malice and could instead have been reached on a theory of felony murder. Because defendant was the actual killer, he was not entitled to relief pursuant section 1172.6 as a matter of law. He has identified no basis for relief, nor have we. We affirm.

## PROCEDURAL SUMMARY

On July 9, 2003, the Tulare County District Attorney filed an information charging defendant with the first degree murder of Dina Guzman (§ 187, subd. (a); count 1) and alleging that defendant personally used a firearm causing great bodily injury and death to Guzman (§ 12022.5, subd. (d)).

On November 15, 2004, the jury found defendant not guilty of first degree murder but guilty of the lesser offense of second degree murder and found true the firearm allegation as charged.

On January 11, 2005, the trial court sentenced defendant to an aggregate term of 40 years to life as follows: on count 1, 15 years to life, plus a 25-year-to-life enhancement for personal use of a firearm causing great bodily injury or death.

---

recitation. The appellate court shall send a copy of the brief to the defendant informing the defendant of the right to file a supplemental brief and that if one is not filed within 30 days, the court may dismiss the matter. If a supplemental brief is filed, we must evaluate the contentions in it. If a supplemental brief is not filed, we may dismiss the appeal as abandoned without a written opinion. However, we retain discretion to independently review the record. (*Delgadillo*, at pp. 229–230.) Thus, in *Delgadillo*, the Supreme Court exercised that discretion because the notice sent to Delgadillo was "suboptimal," having cited *Wende* after counsel had filed a *Wende* brief, but not mentioning that Delgadillo's appeal might be dismissed if he did not file a supplemental brief, thereby making it "reasonabl[e]" for Delgadillo to conclude "that the Court of Appeal would conduct an independent review of the record, even absent a supplemental brief." (*Delgadillo*, at pp. 232–233.) Because the notice sent to defendant in this case was similarly "suboptimal[,]" we exercise our discretion to independently review the record.

On February 27, 2006, defendant's conviction was affirmed on appeal in case No. F047218 in an unpublished opinion.[4]

On March 24, 2022, defendant filed a petition for resentencing and request for appointment of counsel pursuant to former section 1170.95.

On April 4, 2022, the trial court denied defendant's petition, finding that defendant "was the actual shooter."

On May 18, 2022, defendant filed a notice of appeal.

## FACTUAL SUMMARY[5]

"On the evening of May 20, 2003, Guzman, who was a student at a cosmetology school, had plans to practice on her friend [M.V.'s] fingernails. [M.V.] came over to defendant's house to pick Guzman up and drive her to [M.V.'s] house which was about a block away. After Guzman arrived at [M.V.'s] house, she realized she had forgotten to bring her acrylic powder. Guzman seemed upset and said she and defendant had gotten into an argument. Guzman started trying to call her father and sister to have them go to defendant's house to pick up her 'stuff.' Guzman told [M.V's] sister, [K.V.], she wanted to get her stuff because she and defendant were arguing and she did not want to be with him anymore.[6]

---

[4] On defendant's unopposed request, we take judicial notice of our prior opinion in case No. F047218. (*People v. Farias* (Feb. 27, 2006, F047218)[nonpub.opn].) (Evid. Code, §§ 452, subd. (d), 459, subds. (a)–(c).) We decline to take judicial notice of the entire record of appeal in that matter because it would not change the outcome of this opinion in light of the offenses of conviction.

[5] Our factual summary is drawn from the statement of facts presented in this court's opinion on defendant's direct appeal. (*People v. Farias* (Feb. 27, 2006, F047218)[nonpub.opn].)

[6] "[M.V. and K.V.] also testified regarding injuries they had seen on Guzman on two past occasions. According to [M.V.], on one occasion Guzman had a bump on her head but 'stayed silent' when asked about it. The same day, Guzman asked [M.V.] to help her move out of defendant's house. According to [K.V.], when questioned on another occasion about a bruise on her shoulder, Guzman eventually said defendant 'did

4.

"Shortly after Guzman arrived at [M.V.'s] house, defendant's young niece and nephew …, who also lived at defendant's house, came over to speak with Guzman. After the children left, Guzman said she was going back to defendant's house to get her stuff because defendant had left. [M.V.] offered to give Guzman a ride. When they arrived at defendant's house, defendant and his mother were out on the front porch. Defendant was wearing a black and white checkered shirt.

"[M.V.] waited in front of defendant's house in her car. She watched Guzman go directly inside the house through the front door. Defendant and his mother followed her. [M.V.] could see into the house through the big window in the living room. She saw Guzman go straight to her bedroom. Defendant followed her. The children were watching television in the living room. Defendant's mother came back outside and invited [M.V.] inside, explaining it was 'going to be a while.' [M.V.] chose to remain in her car and played a game on her cell phone.

"[Defendant's nephew] heard a noise like a firecracker coming from defendant's bedroom. He and [defendant's niece] went into the bedroom and saw Guzman lying on the floor bleeding. When [defendant's niece] came close to help Guzman, Guzman told the children to move away a little bit because she could not breathe.

"[M.V.] testified that a few minutes after Guzman went into the house, she saw defendant struggling with his father in the hallway. [Defendant's niece and nephew] ran out of the house and starting hitting [M.V.'s] window, screaming at her to call the police and an ambulance. [M.V.] called 911 on her cell phone. Then [M.V.] saw defendant walk to her car but she was not certain what direction he came from. Defendant told [M.V.] that Guzman had been shot, and asked her, 'Did you see anybody at the window?

---

it.' But [K.V.] acknowledged Guzman said this in a 'humorous joking manner' and that she did not believe Guzman at the time."

5.

Did you see any car drive by?' When [M.V.] said no, defendant left and walked away down the street. [M.V.] noticed he was not wearing a shirt.

"A police officer was dispatched to defendant's house in response to the 911 call. As he was getting out of his car, a young girl ran up to him 'very excited and yelled, "She's been shot." ' The girl told the officer it was a drive-by shooting. When the officer went inside the house, he saw defendant's father holding Guzman, who was then lying in the hallway. The officer checked Guzman's pulse but found none. A short time later, emergency personnel transported Guzman to the hospital.

"On May 25, 2003, five days after the shooting, defendant called Marcelino Morales, a private investigator, and asked Morales to help him turn himself in to the police. Defendant met Morales in Hanford. Defendant seemed sad and scared. Morales drove defendant to the Visalia Police Department. Defendant was arrested around midnight.

"According to the pathologist who performed Guzman's autopsy, she bled to death from her gunshot wounds. Guzman had two wounds as a result of a single gunshot: an entry wound in her upper chest and an exit wound in her lower back. According to the pathologist, the bullet 'traveled in basically a general front-to-back direction with moderate downward deviation, and right to left.'

"A crime scene investigator measured defendant's bedroom and determined it was approximately nine and a half feet by nine and a half feet. There was blood on the carpet and blood spatter on the east wall and on the television in front of the wall. The lowest portion of blood spatter on the wall was one foot, three and a half inches from the floor. The highest portion was four feet, seven and a half inches from the floor. A hole was found in the east wall but the cause of the hole was not determined.

"One of the detectives found a .38-caliber Smith & Wesson Special revolver in a woodpile in the backyard. The gun contained five live rounds and one spent casing, indicating one bullet had been fired. Despite performing a thorough search, investigators

6.

were unable to find the bullet. A single latent fingerprint obtained from black electrical tape wrapped around the handle of the gun did not match either defendant or Guzman.

"Guzman's hands were processed for gunshot residue. According to criminalist Steven Dowell, particles collected from her hands and hairline were consistent with gunshot residue. Dowell opined Guzman could have gotten the residue on her body one of three ways: by discharging a firearm, by being in close proximity to a firearm when it was discharged, or by having a hobby or occupation that put her in contact with particles consistent with gunshot residue.

"Steven O'Clair, a firearms examiner and blood spatter expert, reviewed the physical evidence and concluded Guzman was shot at close range from inside the bedroom, with the gun being fired at least two feet from the front of her shirt. Based on the location of the blood evidence, O'Clair opined that, when she was shot, Guzman was standing two to three feet from the east wall, and that afterward she collapsed next to the bed. O'Clair also tested the gun and determined it could fire both single action (firing after pulling back the hammer and then pulling the trigger) and double action (firing by just pulling the trigger). He determined that if used as a single action it would require two and a half to three pounds of pressure to discharge the firearm. If used as a double action, eight to nine pounds of pressure would be needed to discharge the gun.

"**The Defense**

"Peter Barnett, a defense criminalist and blood spatter expert, disagreed with O'Clair's opinion that Guzman was shot as she stood with her back to the east wall of defendant's bedroom. Rather, the evidence suggested to him that Guzman was in a position lower than the shooter, such as kneeling or bending over. Barnett opined the blood spatter on the wall was not caused by the impact of the bullet or the exiting of the bullet but rather came from by some 'post shooting movement' by Guzman or some object that had come in contact with her, including people who were trying to render her aid. Barnett concluded that when Guzman was shot, she was likely sitting on the bed or

7.

backed up against the bed, in a 'low down position and probably bent forward a little bit….'

"Defendant testified on his own behalf. He admitted he had previously been convicted of a felony in January 2000. According to defendant's testimony, he met Guzman in August 2002 at a cousin's birthday party. They began dating shortly thereafter. In October 2002, Guzman came to live with defendant at his parents' house.

"Guzman usually held down more than one job at a time because she liked to work and stay busy. Eventually, she enrolled in a school to study cosmetology. Defendant helped her pay for school by working for his brother in a roofing company.

"Defendant bought a lot of presents for Guzman, including belts and rings. Defendant bought Guzman a 'promise ring' which she would refer to as her 'engagement ring.' Although they had discussed getting married, defendant and Guzman had never made specific plans, such as setting a wedding date.

"While they were living together, Guzman left defendant three times after they had had disagreements. Various friends and family members would come over and help her move all her belongings out of defendant's room. Defendant explained that when Guzman was upset or angry, her typical response was 'just try to avoid the situation and just like walk away….'

"Defendant testified that two days before Guzman was killed, there had been a drive-by shooting at his house around two or three o'clock in the morning. The bullet struck near where [defendant's niece and nephew] slept in the living room.[7] Two police officers came to the house and took a report. They also searched the premises but did not find anything. The next day, defendant found a shell casing outside the house.

---

**7** "During the prosecution's case, [defendant's niece] testified she did not hear anything on the night of the drive-by shooting but was awakened by the noise of defendant and her grandparents talking. After that, police arrived and took pictures."

8.

"The day after the drive-by shooting, defendant purchased a gun from his friend for about $100. Defendant knew it was illegal for him to own or possess a firearm because of his prior conviction. He did not tell Guzman he bought the gun because she would not have allowed him to have it. Defendant put the gun between the two mattresses on his bed. Defendant ordinarily kept his bedroom door locked for privacy because children were often in and out of the house. Both he and Guzman had a key to the room.

"On May 20, 2003, Guzman called defendant and asked him if he would pick her up from work. When defendant told her he did not have access to a car, she responded, 'Well fine. Whatever.' She then hung up the phone. When Guzman got back to the house, she was already upset with defendant because he did not pick her up and because he had forgotten his sister's birthday the day before. Guzman went to their bedroom while defendant went out to the backyard.

"A short time later, defendant went into the bedroom. Guzman was sitting on the bed with items, including scissors and a pen. She was putting together a birthday gift for defendant's sister. While Guzman and defendant were 'still arguing,' Guzman said she had to go do [M.V.'s] nails and left the bedroom to call [M.V.] from the kitchen. When she tried to get back into the bedroom, she found it was locked and asked defendant to open the door. Defendant refused, saying, 'No. You got your own key.' Guzman told defendant to open the door and 'quit acting like a jerk.' Defendant again refused to open the door. Guzman then said she would get her stuff later and left with [M.V.] Guzman seemed to want to get back into the room to get additional cosmetic supplies and defendant remembered her mentioning powder she needed.

"After Guzman left, defendant sat on the porch and ate some food his mother prepared. During this time, defendant 'cooled off' from his argument with Guzman. Defendant realized his actions had been 'stupid' and 'immature.' [Defendant's niece and

9.

nephew] were playing in the front yard. Defendant asked [his nephew] to go tell Guzman to call him or come back and get whatever she needed.

"Guzman returned to the house and defendant let her into their bedroom. Defendant went to the kitchen to put his bowl down and have a glass of water. A few minutes later, he went into the bedroom. He found Guzman standing next to the bed. She was holding the gun by the barrel and looking at it. Defendant closed the door. Guzman asked, 'What the hell do you want this for. I told you about this. I thought we talked about this…. I told you, not again.' Defendant explained they needed the gun for protection. They started arguing and Guzman said she was going to get rid of the gun. As they argued, Guzman was waving the gun around. Defendant grabbed the gun and they started to have a 'little tug of war' with it. Guzman was holding the barrel of the gun with both hands. As she lost hold of the gun and slipped backwards onto the bed, the gun went off.

"Guzman started to slump down and defendant saw blood on her shirt. He hugged her because she was falling down onto the bed. Defendant then put her down on the floor and tried to give her mouth-to-mouth resuscitation. Defendant's parents came into the bedroom and started asking what had happened. Everyone started yelling and defendant told them to call for an ambulance. Defendant got up and went to the telephone and tried to dial 911 but could not do it because he was in shock. When defendant tried to go back into the bedroom, his father grabbed him and stopped him. Defendant's father said, 'We're gonna handle this.' He then pushed defendant and told him to '[g]et out of here.'

"Defendant walked out the front of the house and told [M.V.] that Guzman had been shot and to call 911. Defendant then walked away and went to a friend's house. Defendant explained he walked away because he was scared, in shock, and 'couldn't believe what just happened.' Defendant had his friend call to find out if Guzman was all right. After his friend made the call, he came back and told defendant Guzman had died.

10.

"Before turning himself in, defendant stayed at different friends' houses. This time was a 'nightmare' for him. Defendant was very depressed. He wanted to turn himself in but felt he needed somebody to help him because he was scared and in a state of shock. Defendant remembered his sister had a friend who was a private investigator and got the telephone number. After defendant contacted the investigator, they met and the investigator drove defendant to the police station, where defendant was handcuffed and taken to an interview room. A detective advised defendant of his rights and asked him if he knew why he was there. As soon as the detective said Guzman's name, defendant broke down crying and the interview was terminated shortly thereafter because defendant was crying uncontrollably.

"Defendant denied telling [M.V.] there had been a drive-by shooting or asking her if she had seen anybody. Defendant also claimed he did not know who hid the gun in the woodpile. Defendant denied hitting Guzman during the eight months they were together." (*People v. Farias* (Feb. 27, 2006, F047218)[nonpub.opn].)

## DISCUSSION

### *Wende* Review

As noted above, defendant's appellate counsel filed a brief pursuant to *People v. Wende*, *supra*, 25 Cal.3d 436, asserting he could not identify any arguable issues in this case. After defendant's appellate counsel filed his *Wende* brief, by letter dated October 18, 2022, we invited defendant to inform this court of any issues he wished addressed. On November 2, 2022, we received defendant's response to our letter, alleging that he was entitled to relief pursuant to section 1172.6 because "the jury returned with the verdict of second degree felony murder doctrine [which] does not require the jury to [find] express or implied malice." Defendant does not comment on the jury's finding that he personally discharged a firearm causing great bodily injury and death. As the trial court correctly concluded, the jury's true finding on that allegation was fatal to his petition as a matter of law.

11.

"Effective January 1, 2019, the Legislature passed Senate Bill 1437 'to amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' (Stats. 2018, ch. 1015, § 1, subd. (f).)  In addition to substantively amending sections 188 and 189 …, Senate Bill 1437 added section 1170.95 [now renumbered as section 1172.6], which provides a procedure for convicted murderers who could not be convicted under the law as amended to retroactively seek relief." (*People v. Lewis* (2021) 11 Cal.5th 952, 959.)

In October 2021, Senate Bill No. 775 was enacted and amended former section 1170.95, effective January 1, 2022. (2021–2022 Reg. Sess.)  (Stats. 2021, ch. 551, § 1).  As a result of these amendments, section 1172.6 provides that "person[s] convicted of felony murder or murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime, attempted murder under the natural and probable consequences doctrine, or manslaughter," may file a petition to have that conviction vacated under certain circumstances.  (§ 1172.6, subd. (a).)

It is undisputed that the jury found defendant guilty of murder because he was the actual killer, as evidenced by the true finding on the personal discharge of a firearm causing great bodily injury or death allegation (§ 120225, subd. (d)).  He was not entitled to relief pursuant to former section 1170.95 or section 1172.6. (*People v. Harden* (2022) 81 Cal.App.5th 45, 59–60.)  No error resulted from denial of defendant's petition.

After a thorough review of the record, we agree with defendant's appellate counsel there are no arguable issues in this case.  Defendant's petition was properly denied and there is nothing in this record to suggest any error occurred.

### DISPOSITION

The order is affirmed.